## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| OLIVER SHIH, Individually and on Behalf of All Others Similarly Situated, | **Case No.** |
| Plaintiff, | **CLASS ACTION COMPLAINT** |
| v. | **JURY TRIAL DEMANDED** |
| AMYLYX PHARMACEUTICALS, INC., JOSHUA B. COHEN, JUSTIN B. KLEE, JAMES M. FRATES, and MARGARET OLINGER, | |
| Defendants. | |

Plaintiff Oliver Shih ("Plaintiff"), individually and on behalf of all others similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States ("U.S.") Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Amylyx Pharmaceuticals, Inc. ("Amylyx" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial, additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a federal securities class action on behalf of a class consisting of all persons and entities other than Defendants that purchased or otherwise acquired Amylyx securities

between November 11, 2022 and November 8, 2023, both dates inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and certain of its top officials.

2.      Amylyx is a commercial-stage biotechnology company that engages in the discovery and development of treatments for amyotrophic lateral sclerosis ("ALS"), also known as Lou Gehrig's disease, and other neurodegenerative diseases.  The Company's products include, among others, AMX0035 (commercially referred to as "RELYVRIO" in the U.S.), a dual UPR-Bax apoptosis inhibitor composed of sodium phenylbutyrate and taurursodiol, for the treatment of ALS in adults in the U.S.

3.      Following the U.S. Food and Drug Administration's ("FDA") September 2022 approval of RELYVRIO for the treatment of ALS in adults in the U.S., Defendants consistently touted the drug's commercial prospects and prescription rate.

4.      Throughout the Class Period, Defendants made materially false and misleading statements regarding the Company's business, operations, and prospects.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) Defendants had overstated RELYVRIO's commercial prospects; (ii) patients were discontinuing treatment with RELYVRIO after six months; (iii) the rate at which new patients were starting treatment with RELYVRIO was decreasing; (iv) accordingly, Defendants had also overstated RELYVRIO's prescription rate; (v) Defendants attempted to hide the foregoing negative trends from investors and the market  by blocking analysts from viewing RELYVRIO's prescription data; and (vi) as a result, Defendants' public statements were materially false and misleading at all relevant times.

5.      On November 9, 2023, Amylyx issued a press release announcing its third quarter ("Q3") 2023 financial results, including Q3 GAAP[1] earnings per share ("EPS") of $0.30, missing consensus estimates by $0.12.  That same day, on a conference call with investors and analysts to discuss these results, Company management revealed that, despite "a [purported] steady cadence of new prescriptions written in" Q3 for RELYVRIO, Amylyx's "results were impacted by a number of factors" including a "slowdown in net adds" for RELYVRIO in Q3, which "was primarily driven by increased discontinuations for a variety of reasons", with only "60% of people taking RELYVRIO remain[ing] on therapy six months after initiation in the U.S."

6.      Also on November 9, 2023, *Investor's Business Daily* published an article addressing the Company's disappointing financial results (the "*IBD* Article").  The *IBD* Article cited an Evercore ISI analyst, who questioned Amylyx's assertion that the number of new patients starting treatment with RELYVRIO was "steady", noting that his math suggested otherwise and that Amylyx had blocked analysts from viewing RELYVRIO's prescription data in the summer of 2023.  The analyst also stated that, "[k]nowing that [Amylyx's] stock had underperformed in 2023 already, management could have communicated the discontinuations dynamic much earlier," and that the "[s]tock move today in a bad biotech tape and fund performance doesn't help investor confidence among folks that have held onto the stock."

7.      Following these disclosures and the publication of the *IBD* Article, Amylyx's stock price fell $5.74 per share, or 31.89%, to close at $12.26 per share on November 9, 2023.

8.      As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

---

[1] "GAAP" refers to the U.S. generally accepted accounting principles.

## JURISDICTION AND VENUE

9.      The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

10.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act.

11.     Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b).  Amylyx's common stock trades on the Nasdaq Global Select Market ("NASDAQ"), which is located in this Judicial District.

12.     In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

13.     Plaintiff, as set forth in the attached Certification, acquired Amylyx securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

14.     Defendant Amylyx is a Delaware corporation with principal executive offices located at 43 Thorndike Street, Cambridge, Massachusetts 02141.  The Company's common stock trades in an efficient market on the NASDAQ under the ticker symbol "AMLX".

15.     Defendant Joshua B. Cohen ("Cohen") has served as Amylyx's Co-Chief Executive Officer ("Co-CEO") at all relevant times.  Defendant Cohen is also a Co-Founder of the Company.

During the Class Period, Defendant Cohen sold 105,968 shares of Amylyx common stock for total proceeds of over $3.4 million.

16.     Defendant Justin B. Klee ("Klee") has served as Amylyx's Co-CEO at all relevant times.  Defendant Klee is also a Co-Founder of the Company.  During the Class Period, Defendant Klee sold 105,968 shares of Amylyx common stock for total proceeds of over $3.4 million.

17.     Defendant James M. Frates ("Frates") has served as Amylyx's Chief Financial Officer at all relevant times.  During the Class Period, Defendant Frates sold 100,158 shares of Amylyx common stock for total proceeds of over $3 million.

18.     Defendant Margaret Olinger ("Olinger") served as Amylyx's Chief Commercial Officer ("CCO") at all relevant times.  Defendant Olinger left the Company effective December 31, 2023.

19.     Defendants Cohen, Klee, Frates, and Olinger are collectively referred to herein as the "Individual Defendants".

20.     The Individual Defendants possessed the power and authority to control the contents of Amylyx's SEC filings, press releases, and other market communications.  The Individual Defendants were provided with copies of Amylyx's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected.  Because of their positions with Amylyx, and their access to material information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading.  The Individual Defendants are liable for the false statements and omissions pleaded herein.

21.     Amylyx and the Individual Defendants are collectively referred to herein as "Defendants".

## SUBSTANTIVE ALLEGATIONS

### Background

22.     Amylyx is a commercial-stage biotechnology company that engages in the discovery and development of treatments for ALS, also known as Lou Gehrig's disease, and other neurodegenerative diseases.  The Company's products include, among others, AMX0035, a dual UPR-Bax apoptosis inhibitor composed of sodium phenylbutyrate and taurursodiol, for the treatment of ALS in adults in the U.S.

23.     On September 29, 2022, Amylyx announced that it had received FDA approval for AMX0035 for the treatment of ALS in adults in the U.S. under the commercial name RELYVRIO.  The Company launched RELYVRIO in the U.S. on October 24, 2022.

### Materially False and Misleading Statements Issued During the Class Period

24.     The Class Period begins on November 11, 2022.  On November 10, 2022, during after-market hours, Amylyx issued a press release announcing the Company's Q3 2022 financial results.  That press release quoted Defendants Cohen and Klee, who stated, in relevant part:

> We are thrilled that RELYVRIO . . . [is] now available to people living with ALS in the U.S. . . . and *we are encouraged by . . . the rate of new prescriptions for this important new therapeutic option*. We continue to work expeditiously during the early stages of our commercial launch to ensure every eligible person living with ALS will gain access as quickly and efficiently as possible.

(Emphasis added.)

25.     That same day, also during after-market hours, Defendants hosted a conference call with investors and analysts to discuss Amylyx's Q3 2022 results (the "Q3 2022 Earnings Call").  During his prepared remarks on that call, Defendant Klee stated, in relevant part:

Given we are only a few weeks into the launch in the U.S., it is too early to discuss specific expectations. ***But we are encouraged by the initial engagement with both physicians and with people living with ALS.***

(Emphasis added.)

26.    Likewise, during his prepared remarks on the Q3 2022 Earnings Call, Defendant Cohen stated, in relevant part, that "[w]e are excited about the strong initial interest that we are seeing only a couple of weeks into launch" of RELYVRIO.

27.    During her prepared remarks on the Q3 2022 Earnings Call, Defendant Olinger represented, in relevant part:

In the days and weeks following the FDA's approval of RELYVRIO on September 29, ***we immediately started receiving enrollments and prescriptions through the Amylyx Care Team***, and have heard very positive feedback from physicians in the ALS community about the level of support we are providing. Importantly, on October 24, the first shipment of RELYVRIO from one of our specialty pharmacies was sent to a person living with ALS earlier than we had originally anticipated.

In regard to interest in RELYVRIO, ***we are seeing a solid initial bolus, including an encouraging number of products enrollment forms and prescriptions coming into the Amylyx Care Team. This initial excitement has also been widespread across the country, and not limited to one geography or group of physicians.*** The field teams have engaged with clinicians throughout the country, and the feedback from those serving the community has been positive.

(Emphases added.)

28.    During the question-and-answer ("Q&A") portion of the Q3 2022 Earnings Call, in response to an analyst question regarding "how long [Defendants] expect patients to stay on drugs in [Amylyx's] model", Defendant Cohen answered, in relevant part:

[W]hen it relates to time on therapy, we haven't given specific guidance as to time on therapy for our product. ***But I can say we've done some research on past products . . . where we see in the ballpark of a year – on average or median.*** That being said, one of our hopes with having a really robust education and patient support function is that ***we'll be able to educate about the benefits of staying on therapy as well***.

(Emphases added.)

29.     On February 14, 2023, Amylyx filed a current report on Form 8-K with the SEC, stating, in relevant part, that "[t]he Company has observed higher demand for RELYVRIO in the U.S. than initially anticipated pre-launch and, as a result, expects to meaningfully exceed fourth quarter and full-year 2022 Wall Street research analyst consensus estimates for revenue."

30.     On March 13, 2023, Amylyx issued a press release announcing its fourth quarter and full year ("Q4/FY") 2022 financial results.  That press release quoted Defendants Cohen and Klee, who stated, in relevant part:

> 2022 was an exceptionally exciting year for Amylyx, culminating with the approval of RELYVRIO in the U.S. . . . . ***Our commercial launch is off to a strong start, and we are encouraged by the engagement we have seen from physicians, people living with ALS, and payors*** . . . . [W]e remain focused on our efforts to engage stakeholders throughout the ALS community as we work to drive the broadest coverage possible for this important new therapeutic option.

(Emphasis added.)

31.     That same day, Defendants hosted a conference call with investors and analysts to discuss Amylyx's Q4/FY 2022 results (the "Q4/FY 2022 Earnings Call").  During his prepared remarks on that call, Defendant Klee stated, in relevant part, that "[s]ince the approval, we have seen strong interest in RELYVRIO and we are encouraged by the early success of our commercial launch."

32.     Likewise, during his prepared remarks on the Q4/FY 2022 Earnings Call, Defendant Frates stated, in relevant part:

> We're pleased to share that ***at this point in our launch we're meaningfully ahead of our expectations and encouraged by the interest and demand we've seen from the ALS community***. [Defendant Olinger] will share some of the important early metrics that we're tracking, which should help you model our near-term opportunity and the total addressable market for the longer term, but first I'll summarize Q4.
>
> Net product revenues were $21.9 million for the quarter and $22.2 million for the year ***with the vast majority of that revenue from the [U.S.]*** As you'll hear from

Margaret in a few minutes, *we're seeing robust demand from the ALS community*. Gross-to-net adjustments were approximately 18% in the quarter and in-line with our expectations. We expect gross-to-net to remain in the 15% to 20% range for the year starting at the higher end of that range in Q1 due to the annual reset of co-pays and deductibles in Medicare Part D reenrollment as of January 1st.

(Emphases added.)

33.    During her prepared remarks on the Q4/FY 2022 Earnings Call, Defendant Olinger

represented, *inter alia*:

> *[W]e are seeing our efforts yield strong results and have observed rapid uptakes on the FDA's approval on September 29.* There were just over 1300 people living with ALS on RELYVRIO in the [U.S.] at the end of 2022, and *uptake has continued since then*.
>
> We remain optimistic about our ability to continue growing from here as we believe people with ALS and their clinicians are eager to learn about and try new treatment options. *By the end of this quarter we believe we are on our pace to roughly double the amount of people on RELYVRIO on a net basis.*
>
> On the clinician side, *we are encouraged by the prescriptions coming from the top ALS doctors and key ALS centers, but there is still significant opportunity for growth*.

(Emphases added.)

34.    Also during her prepared remarks on the Q4/FY 2022 Earnings Call, Defendant

Olinger further represented, in relevant part:

> *Another notable part of our launch is the interest that we are seeing across the spectrum of people living with ALS when we look at the times of initial diagnosis.* We are encouraged that *regardless of the time since diagnosis, people with ALS are interested in and gaining access to this important new treatment*. In other words, we are seeing people on RELYVRIO who have been newly diagnosed as well as others who have been diagnosed for more than three years.

(Emphases added.)

35.    During the Q&A portion of the Q4/FY 2022 Earnings Call, in response to an analyst

question regarding "whether the patient numbers at the end of December . . . was approaching

about 1500 to 2000," Defendant Frates answered, in relevant part:

*[W]e're seeing the demand increase, right?* And again, [Defendant Olinger] mentioned there were 1300 patients on drug at the end of 12/31 and at the end of Q4, and we're looking at roughly doubling that as we get to the end of March, so 2,600 patients plus or minus.

\* \* \*

And I think I guess I would just say, *we're off to a really good launch*. I think we're probably going to be able to more than double our revenues in Q1. I'd say we'd be closer to tripling our revenues than we are to doubling our revenues, but wouldn't want to give more guidance than that.

(Emphases added.)

36.     Also during the Q&A portion of the Q4/FY 2022 Earnings Call, in response to an analyst question regarding the pace of patients starting treatment with RELYVRIO, "a sense for how we think about the pace of starts after" the first quarter ("Q1") of 2023, and whether Defendants "expect this kind of 1300 patients per quarter to be kind of a sustainable rate or should we expect the pace of new starts to kind of start to decline thereafter", Defendant Olinger stated, in relevant part:

> *So we just want to reiterate, we are very pleased with the growth we're seeing in the second, in Q4 of 2022 and so far this year. And we are -- and things are going really well. We're seeing an initial bolus in demand.* And to be honest with you, we just don't know how big this bolus will be or how long it will last. *But we expect continued growth and interest in demand as the initial prescribing has been relatively concentrated* as I mentioned. We have a large untapped opportunity to build on in our ongoing outreach and education and efforts. *We really see that we have a lot of runway ahead of us.*

(Emphases added.)

37.     In response to the same analyst question, Defendant Klee stated, in relevant part:

[A]nd just one more point, as [Defendant Olinger] emphasized the demand, I think that's on the plus side, right? We're seeing early demand. It's very concentrated so far so we have a lot of breadth and depth to continue to look forward to, I think as we expand this product.

38.     Likewise, in response to an analyst question regarding "what the launch curve might look like with an initial bolus and then steadying out until we get to steady state" and "[h]ow [Defendants] are . . . thinking about it now that [they]'re in the market and seeing kind of the demand that [they]'ve had thus far", Defendant Olinger stated, in relevant part:

> [I]n terms of the slope of the ramp, to your point, it is very early months of the launch, *but we are seeing very encouraged levels of interest from both people living with ALS and clinicians* and we said that Q4, we ended with 13 [later changed by the Company to "1300"] people on therapy. We expect to double that by the end of Q1. And again, I just want to reiterate to everybody that is on a net basis, *which should give you a good sense of how the launch is progressing*. And while we do have that initial bolus of demand, we don't know how big and how long that will last, *we do really are very confident in the long runway we have ahead of us*.
>
> So our focus remains on the 1,300 patients that are on therapy today *and keeping them on therapy*. And then also, we're very encouraged by the insurance favorability that we're seeing, while it's only a third at this point we have very broad access to date, and we're encouraged at the future.

(Emphases added.)

39.     Also on March 13, 2023, Amylyx filed an annual report on Form 10-K with the SEC, reporting the Company's financial and operational results for the quarter and year ended December 31, 2022 (the "2022 10-K"). In discussing Amylyx's commercialization of AMX0035 (in the U.S. as RELYVRIO and in other jurisdictions), the 2022 10-K stated, in relevant part:

> Since obtaining regulatory approval, *we have seen strong interest in AMX0035, and we are encouraged by the early success of our commercial launch*. We believe the global commercial opportunity for AMX0035 in ALS is driven by its being the first and only treatment for ALS of which we are aware that potentially provides a combination of longer retention of function, improved survival, a generally well-tolerated side effect profile and convenient oral administration. AMX0035 has been shown to have a significant impact on clinically meaningful endpoints, including reducing time to first hospitalization and permanent ventilation in ALS patients.

* * *

We have conducted market research with physicians, patients, caregivers, nurses, and payors in the U.S., Western Europe and Canada to understand the unmet need and potential of AMX0035 in ALS. Clinicians universally report dissatisfaction with currently approved therapies and state the need for additional options for their ALS patients. ***When shown a target product profile for AMX0035, the majority of ALS specialists and neurologists with whom we spoke are open to utilizing it in early-to-mid-stage patients, with some also stating the potential for use in late-stage patients.***

(Emphases added.)

40.     Moreover, in discussing Amylyx's strategy to "***[e]ffectively and efficiently commercializ[e] RELYVRIO for ALS in adults in the U.S.***" (emphasis in original), the 2022 10-K touted the Company's "commercial capabilities, coupled with our understanding of the ALS patient and medical community," as a key element that "will enable us to successfully commercialize RELYVRIO for ALS in the U.S."

41.     The 2022 10-K also represented that "as we begin to commercialize RELYVRIO in the U.S. . . . and learn more about market dynamics . . . our view of our products' initial potential market opportunity will become more refined", thereby assuring investors that Defendants' understanding of  RELYVRIO's commercial prospects, including, presumably, its prescription rate, would become more accurate with time, and investors could, therefore, trust Defendants' representations concerning RELYVRIO's commercial prospects and prescription rate.

42.     Appended as exhibits to the 2022 10-K were signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"), wherein Defendants Cohen, Klee, and Frates certified that "th[e 2022 10-K] does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by th[e]" 2022 10-K, and that "the financial statements, and other financial information included in th[e 2022 10-K], fairly

present in all material respects the financial condition, results of operations and cash flows of [Amylyx] as of, and for, the periods presented in th[e]" 2022 10-K.

43.     On May 11, 2023, Amylyx issued a press release announcing its Q1 2023 financial results.  That press release quoted Defendant Cohen, who stated, in relevant part:

> *During [Q1], we made significant progress on our commercial launches of RELYVRIO in the U.S.* . . . as we advanced our goal of ensuring efficient access for every eligible person living with ALS. *We continue to see strong engagement and interest from physicians and the ALS community* and are encouraged that the vast majority of payors who have published formal policy decisions are providing broad access to RELYVRIO.

(Emphases added.)

44.     That same day, Defendants hosted a conference call with investors and analysts to discuss Amylyx's Q1 2023 results (the "Q1 2023 Earnings Call").  During his prepared remarks on that call, Defendant Klee stated, in relevant part:

> *In [Q1], we saw a continued high level of interest from the ALS community* and RELYVRIO broadened insurance coverage, *and high levels of engagement* with our Amylyx care team, also known as act, *just two quarters into launch over 10% of the approximately 29,000 people living with ALS in the US are now on RELYVRIO*. Even with that success in our first six months, we have more to do. There remain many more 1000s of people living with ALS in the US and at least 200,000 people living with ALS globally. We are still in the early stages of our journey, and our team remains hard at work.
>
> * * *
>
> *Our commercial ramp in the U.S. . . . is proceeding very well* . . . . And we achieved our first quarter of profitability in just the second quarter of our commercial launch in the U.S.

(Emphases added.)

45.     Likewise, during his prepared remarks on the Q1 2023 Earnings Call, Defendant Frates stated, in relevant part:

> *We're encouraged by the strong interest in demand we continue to see from the ALS community.* From a financial point of view, our business[ is] strong. Net

product revenue were $71.4 million for the quarter, compared to net product revenue of $21.9 million for the fourth quarter of 2022 **with the vast majority of that revenue from the [U.S.]**

\* \* \*

I want to pause a moment on our overall financial results **with the strong demand for RELYVRIO driving near term profitability ahead of our expectations**. We want to reiterate our long term financial goals driving top line revenues as RELYVRIO become standard of care, growing profitability for our investors, and investing in a pipeline that has the potential to provide much needed treatments for neurodegenerative diseases. **We're well-positioned to build a profitable financially strong organization for the long term** . . . . We're currently in a position to fund the programs, we discussed it without the need to raise additional capital.

(Emphases added.)

46.     During her prepared remarks on the Q1 2023 Earnings Call, Defendant Olinger

represented, *inter alia*:

> **We are seeing continued interest and demand for RELYVRIO.** As of March 31, there were roughly 3000 people on RELYVRIO in the US more than double the number of people on RELYVRIO at the start of the quarter. We are pleased that this many people have gained access to our important treatment.
>
> I think it's worth spending a minute to provide some additional context on the strength of our launch. While we knew there was pent up demand, **the fourth quarter and first quarter, were still well ahead of our expectations**. The rate of net patient's [indiscernible] has begun to moderate as expected. **However, we still see significant demand for people living with ALS, and physicians alike.** Importantly, we still have plenty of room for growth, both at the top ALS centers, and the broader neurology community. [indiscernible].
>
> Now, let me run through a few metrics that show our progress, but also the growth opportunities ahead of us. By the end of the first quarter, approximately 65% of the top 500 US prescribers and approximately 95% of the key ALS centers had prescribed RELYVRIO out to at least one person since launch. **Prescribing remains fairly concentrated**, with roughly 80 prescribers mostly at major ALS centers, representing approximately half of all RELYVRIO prescriptions during the quarter. While we are encouraged with these data points, **we see an opportunity for broader and deeper uptake of key ALS centers, and the opportunity to continue to penetrate the group of top prescribers**.

(Emphases added.)

47.     Also during her prepared remarks on the Q1 2023 Earnings Call, Defendant Olinger further represented, in relevant part, that "[w]e continue to see a wide range of people living with ALS in terms of time sense initial diagnosis, interested in and gaining access to RELYVRIO", while reiterating that "[o]ur launch is off to a strong start."

48.     During the Q&A portion of the Q1 2023 Earnings Call, in response to an analyst question regarding "the [moderated] rate of pace" of new patients for RELYVRIO and "expectations going to perhaps the second quarter", Defendant Olinger stated, in relevant part:

> *[W]e continue to be incredibly pleased with our launch today* . . . . [I]f I could just reiterate a few key points, *we ended the quarter with roughly 3000 patients, again, double what we started with at the beginning of the quarter*.
>
> And that's about 10% of the 29,000 patients living with ALS. So not surprisingly, our net patient ads can't double forever. So in Q2 we are expecting the number will be lower than what we delivered in Q4 and Q1. *I think more importantly, we continue to see significant interest in demand for RELYVRIO* both from patients and HCP. And *we have a tremendous opportunity for us to grow both in depth and breadth at all the key ALS centers*[.]

(Emphases added.)

49.     Similarly, in response to another analyst question regarding "the rate of net patient ads . . . beginning to moderate" and whether Defendants "[c]ould . . . perhaps provide any updated views on how big this initial bolus of patients could be" and "how long it could last before [Defendants] achieve a steady state trajectory of new starts", Defendant Olinger stated, in relevant part:

> Regarding the bolus, it's really too early to tell when the bolus will finish. *But what I can say is that we know in Q4 and in Q1, we did see that high level of demand due to the pent up demand that we had. And they were quite frankly, even ahead of our expectations.* So we have begun to see the rate and new patient ads moderate. But again, *I want to reiterate, we have a tremendous opportunity for growth*, because even within the key accounts that we penetrated. And just remind you of some of the metrics, we said 95% of all the key ALS centers have prescribed for at least one patient every account, you see one account, you see one account. It's typical rare disease. So some accounts are highly penetrated. And some accounts

have a great deal of room ahead of us to penetrate. And we really have just started to get out into the broader neurology community. ***So again, we see tremendous growth ahead of us to serve all the remaining patients that are depending on us.***

(Emphases added.)

50.     In response to yet another analyst question during the Q1 2023 Earnings Call regarding "what you're seeing in terms of start forms versus net ads", whether Defendants "can talk about the trend you're seeing there", and whether Defendants could provide "any color on duration of therapy so far, or any dropouts that you're seeing", Defendant Klee largely deflected the question, answering, in relevant part:

So we're not providing any guidance on the number of patients for the quarter again, I'll just go back to, we think our net patient adds, they can't double forever. So we'll be lower in Q2 than we've been able to deliver in Q4, Q1 because we believe that was the initial pent up demand. Again, we don't know, when that bolus will be over. So it's hard for us to really give any guidance on that. In terms of duration of treatment, it's really too early in the launch to give that I mean, the first patients who started on therapy, we're basically at the end of October, beginning of November. So they really haven't been on therapy long enough for us to give, any, any clarification there. In terms of discontinuation rates, that's sort of similar as well. People just haven't been on therapy long enough, I can tell you that the general trends that we're seeing are kind of in law, in line with what we saw with Centaur nothing is, out of line there. And just as a reminder, with Centaur we seen roughly about a 25% discontinuation rate at six months. So, again, patients haven't really been on therapy for six months yet. So we're going to continue to monitor that very closely.

51.     Also on May 11, 2023, Amylyx filed a quarterly report on Form 10-Q with the SEC, reporting the Company's financial and operational results for the quarter ended March 31, 2023 (the "Q1 2023 10-Q").  The Q1 2023 10-Q contained the same statements as referenced in ¶ 41, *supra*, assuring investors that Defendants' understanding of RELYVRIO's commercial prospects, including, presumably, its prescription rate, would become more accurate with time, and that investors could, therefore, trust Defendants' representations concerning RELYVRIO's commercial prospects and prescription rate.

52.     Appended as exhibits to the Q1 2023 10-Q were substantively the same SOX certifications as referenced in ¶ 42, *supra*, signed by Defendants Cohen, Klee, and Frates.

53.     On August 10, 2023, Amylyx issued a press release announcing its second quarter ("Q2") 2023 financial results.  That press release quoted Defendants Cohen and Klee, who stated, in relevant part, that "*[w]e made strong and steady progress on our commercial launches in [Q2]*, supporting people living with ALS with increased access to RELYVRIO" (emphasis added).

54.     That same day, Defendants hosted a conference call with investors and analysts to discuss Amylyx's Q2 2023 results (the "Q2 2023 Earnings Call").  During his prepared remarks on that call, Defendant Klee stated, in relevant part:

> *In [Q2], we made significant progress in bringing RELYVRIO . . . to people with ALS in the US[.]*
>
> * * *
>
> Let me walk you through our progress. ***Our commercial organization is off to a strong start . . . as evidenced by the strong and steady demand we saw in [Q2].*** As of June 30, 2023, there were roughly 3,800 people on RELYVRIO in the US, up from roughly 3,000 people on RELYVRIO as of March 31, 2023 and just over 1,300 at the end of 2022.

(Emphases added.)

55.     Similarly, during his prepared remarks on the Q2 2023 Earnings Call, Defendant Frates stated, in relevant part:

> *We're encouraged by the strong interest and demand we continue to see from the ALS community in the second quarter.* From a financial point of view, our business remains strong.
>
> Net product revenues were $98.2 million for the quarter, compared to net product revenue of $71.4 million for the first quarter of 2023, ***with the vast majority of that revenue coming from the [U.S.]***

(Emphases added.)

56.     Likewise, during her prepared remarks on the Q2 2023 Earnings Call, Defendant

Olinger represented, in relevant part:

> *During [Q2], interest in and demand for RELYVRIO continued to build at a steady pace from both those that are newly diagnosed and people who have been living with ALS for years.*
>
> * * *
>
> Now, let me run through a few key metrics that demonstrate our progress and growth opportunities ahead of us. *Prescribing remains fairly concentrated* with just over 80 prescribers mostly at major ALS centers representing approximately half of all RELYVRIO prescriptions at the end of the quarter.
>
> *We are encouraged by the level of interest among this group and believe that we have an opportunity for growth as we bring our message to more prescribers* and deepen our relationships within these key ALS centers.

(Emphases added.)

57.     During the Q&A portion of the Q2 2023 Earnings Call, in response to an analyst

question regarding "what are you seeing with respect to . . . discontinuation rates" and whether

Defendants "[a]re . . . seeing any emerging trends with respect to the primary reason for

discontinuation", Defendant Olinger stated, in relevant part:

> [A]s a reminder, we report on net patients on therapy. So this is inclusive of any discontinuation. We are really pleased with our ability to serve the roughly 3,800 net patients on RELYVRIO at the end of Q2. *I would say it's really too early to see any long-term trends at this point in our launch.* But maybe a reference point in the CENTAUR trial, which again, as a reminder, was a six-month trial. Approximately 70% of participants remained on drug, and *we're tracking close to that in terms of the commercial setting*. But I would say this is clearly an area where we're going to continue to keep a very close eye on as we expect the patient mix to shift over time.

(Emphases added.)

58.     Likewise, in response to an analyst question regarding whether Defendants "have

any better sense of the size of the patient bolus at this point" and the discontinuation rates,

particularly "among the early patients t[hat] have received [the] commercial drug in 4Q of last year

18

[who are] presumably some of the[] patients [that] are -- would have been on drug for at least six months now", and whether Defendants could "provide any color as to what percent of them are still on therapy at this point again just among the patients who started in 4Q", Defendant Olinger largely deflected the question, stating, in relevant part:

> Maybe I'll just start with your question regarding the bolus. ***We continue to be pleased that the interest in and demand for RELYVRIO, continues to be as at a very strong pace and I think importantly includes a mix of both newly diagnosed patients and people who have been diagnosed and living with ALS for many years.***
>
> Again at the end of Q2, we had roughly 3,800 net patients on therapy up from roughly 3,000 patients in Q1 and just over 1,300 in Q4. ***So we really believe that at this point in time RELYVRIO is really starting to become a foundational therapy in ALS and meeting a really high unmet need for this patient community*** which is obviously our mission and what we've been focused on for some time.
>
> As far as the growth opportunities which is equally important to us we see several different opportunities ahead of us. First ***the prescribing remains really concentrated*** with the 80 prescribers mostly at the major ALS centers where our focus was at the beginning of launch representing about half of all RELYVRIO prescriptions this quarter. ***We're also encouraged that the level of interest among this group and believe that we have a large opportunity for growth ahead of us.*** As we bring our messaging to more prescribers and deepen our relationships within those key centers. And I think importantly with those prescribers be much more prolific in their prescribing which I think is an important part.
>
> And second ***we have a really large untapped opportunity for growth outside of this group***. As I mentioned, we were heavily focused on the key ALS centers at launch. We're continuing to expand our outreach and educational efforts more broadly because we believe it's critically important that everybody is aware that RELYVRIO is the first-and-only product to have both function and survival demonstrated in the clinical trial and we believe we can change the paradigm for treatment moving forward. And maybe ***just to answer your second question on discontinuation, again, we're only going to be reporting on net patient numbers for a quarter***. But indeed, I think it's important to reflect that the first cohort of patients who started on therapy at launch many of those who have been really fairly progressed early on. So I think we're going to see the dynamic of the patients change over time. ***So it's a little too early to really give any trends there.***

(Emphases added.)

59.     In response to the same analyst question, Defendant Cohen stated, in relevant part, that "in some of central study approximately 70% of people completed that study on study drug" and "what we're seeing in the real world is not so different from that."

60.     Similarly, when asked by an analyst on the same call regarding "what kind of trends you're seeing you saw in July", Defendant Frates largely deflected the question, stating, in relevant part:

> *[I]n terms of July, I think we'll comment on the July trends when we report our quarterly results for Q3.* But I think our business is -- with now three quarters under our belt, we're all starting to get a chance to see what our business is like moving forward. *But we won't be giving specifics on July at this stage.*

(Emphases added.)

61.     Presumably dissatisfied with the Individual Defendants' responses regarding what they observed vis-à-vis prescription rate trends for RELYVRIO, as well as the retention rate of patients using RELYVRIO for ALS treatment, yet another analyst attempted to elicit some color on these issues on the Q2 2023 Earnings Call.  However, in response, Defendants Klee and Olinger again largely deflected the question:

> **[Analyst]**
>
> Thanks so much. Congrats on the quarter. Just two questions. One *maybe another way to ask a question that people seem to be trying to get at. Do you have any color on -- or can you provide any color on kind of new prescription trends versus refill trends? Any metrics you can provide there and how that's evolved?*
>
> \* \* \*
>
> **[Defendant] Klee**
>
> So I'll start and then have [Defendant Olinger] join in too. So again, we're three quarters into launch. We have roughly 3,800 net people on treatment as of the end of Q2 which we're very pleased about. I mean, that's 3,800 people with ALS we're helping. But that means that there's many, many more people that we'd like to help as well.

But I think we all here are constantly reminded of the mission at hand. And I think the ALS market in many ways is unique. And it's because it's a large rare disease, there's a huge unmet medical need. And historically there have been few treatment options.

And so I think the way that we've thought about our business, as Margaret was sharing, is to focus on the ALS specialists, and then continuing to look to broaden out. And so I think as we look at our prescription numbers, where our people have focused is where we're seeing the prescriptions as well.

And then [Defendant Olinger], I'll invite you to share any more details on that.

**[Defendant] Olinger**

Yeah. As we've indicated heavily focused at launch which I think was the right strategic decision to focus on the key ALS centers where the majority of ALS patients are actually treated.

However, there's also a number of ALS patients that are treated outside of ALS centers for multiple reasons, either they can't transport, they can't get there at a reasonable time and it's -- they typically need to go there every quarter to see the multidisciplinary care.

There are a number of General and Community Neurologist, that are equally important to be educated and that's where we're expanding our focus. And we are continuing to increase our penetration and reach out to those, what we call our Tier A or B targets.

And we're just going to continue to work on that expansion moving forward, because it's really important for us that every physician who treats an ALS patient is educated about the significant RELYVRIO benefits that we can bring to be able to serve this patient community optimally.

(Emphasis in bold and italics added.)

62.     Also on August 10, 2023, Amylyx filed a quarterly report on Form 10-Q with the SEC, reporting the Company's financial and operational results for the quarter ended June 30, 2023 (the "Q2 2023 10-Q").  The Q2 2023 10-Q contained the same statements as referenced in ¶ 41, *supra*, assuring investors that Defendants' understanding of RELYVRIO's commercial prospects, including, presumably, its prescription rate, would become more accurate with time,

and that investors could, therefore, trust Defendants' representations concerning RELYVRIO's commercial prospects and prescription rate.

63.     Appended as exhibits to the Q2 2023 10-Q were substantively the same SOX certifications as referenced in ¶ 42, *supra*, signed by Defendants Cohen, Klee, and Frates.

64.     The statements referenced in ¶¶ 24-63 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) Defendants had overstated RELYVRIO's commercial prospects; (ii) patients were discontinuing treatment with RELYVRIO after six months; (iii) the rate at which new patients were starting treatment with RELYVRIO was decreasing; (iv) accordingly, Defendants had also overstated RELYVRIO's prescription rate; (v) Defendants attempted to hide the foregoing negative trends from investors and the market  by blocking analysts from viewing RELYVRIO's prescription data; and (vi) as a result, Defendants' public statements were materially false and misleading at all relevant times.

### The Truth Emerges

65.     On November 9, 2023, during pre-market hours, Amylyx issued a press release announcing its Q3 2023 financial results, including Q3 GAAP EPS of $0.30, missing consensus estimates by $0.12.  That same day, on a conference call with investors and analysts to discuss these results (the "Q3 2023 Earnings Call"), Defendant Olinger revealed that, despite "a [purported] steady cadence of new prescriptions written in" Q3 for RELYVRIO, patients were discontinuing treatment with RELYVRIO after six months, stating, in relevant part:

> [W]e saw a steady cadence of new prescriptions written in the third quarter . . . . As we think about how our growth has evolved this year, *the slowdown in net adds this quarter was primarily driven by increased discontinuations for a variety of reasons*.

* * *

**60% of people taking RELYVRIO remain on therapy six months after initiation in the U.S.** We believe **some** discontinuations are addressable[.]

(Emphases added.)

66.     Defendant Frates likewise confirmed on the Q3 2023 Earnings Call that "[o]ur results were impacted by a number of factors" including "what [Defendant Olinger] mentioned earlier"—*i.e.*, an increased rate of patients discontinuing treatment with RELYVRIO and a slowdown in the net addition of new patients for RELYVRIO.

67.     Later that day, during intraday trading hours, *Investor's Business Daily* published an article addressing the Company's disappointing financial results, entitled "Amylyx Crashes 27% As New ALS Drug Faces A Barrage Of Troubles".  The *IBD* Article (as published during intraday trading hours[2]) stated, in relevant part:

> Amylyx . . . meaningfully missed Wall Street's expectations on Thursday amid struggles with its [ALS] drug. AMLX stock crashed in morning trades.
>
> * * *
>
> Amylyx noted patients are dropping off Relyvrio treatment after six months, Evercore ISI analyst Michael DiFiore said in a report. But Amylyx said the number of new patients starting treatment was "steady." DiFiore says his math suggests otherwise.
>
> He also noted Amylyx blocked analysts from seeing Relyvrio prescription data this summer.
>
> "Knowing that stock had underperformed in 2023 already, management could have communicated the discontinuations dynamic much earlier," he said. "Stock move today in a bad biotech tape and fund performance doesn't help investor confidence among folks that have held onto the stock."

---

[2] During after-market hours, the *IBD* Article was later renamed "Amylyx Crashes 32% On A Quarterly Report That Doesn't Bode Well For 2024", the contents of which were slightly edited to, among other things, provide an update the Company's stock price movement later in the day.

In midday trades on today's stock market, AMLX stock plummeted 27.2% near 13.10.

**AMLX Stock: Wide Sales, Earnings Misses**

Overall, Relyvrio generated $102.7 million in sales. Though sales grew almost 5% sequentially, they missed analysts' forecasts, which ranged from $108.5 million to $113.8 million, Mizuho Securities analyst Graig Suvannavejh said in a report.

\* \* \*

Evercore's DiFiore says AMLX stock analysts' views for 2024 will "need to come down meaningfully." Analysts currently project $591 million in U.S. sales of Relyvrio. But he says $500 million is closer to what the Street should expect.

"I assume discontinuation rate at month six slows a bit — but not majorly," he said. "New adds improves a bit — but not majorly. Net price per patient stays flat."

68.     Following these disclosures and the publication of the *IBD* Article, Amylyx's stock price fell $5.74 per share, or 31.89%, to close at $12.26 per share on November 9, 2023.

69.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

**Post-Class Period Developments**

70.     On December 7, 2023—*i.e.*, less than a month after the truth regarding RELYVRIO's commercial prospects and prescription rates were revealed—Amylyx announced the departure of Defendant Olinger as the Company's CCO, effective December 31, 2023. Although no explanation was given for her departure, as CCO, Defendant Olinger was primarily responsible for RELYVRIO's commercial development throughout the Class Period, and the timing of her departure appears to, at minimum, correlate with the negative revelations regarding RELYVRIO's commercial development as alleged herein.

## SCIENTER ALLEGATIONS

71.     During the Class Period, Defendants had both the motive and opportunity to commit fraud.  Indeed, during the Class Period, while disseminating the materially false and misleading statements and omissions alleged herein that artificially inflated the market prices of Amylyx securities, Defendants Cohen and Klee each sold 105,968 shares of Amylyx common stock for total proceeds of over $3.4 million, while Defendant Frates sold 100,158 shares of Amylyx common stock for total proceeds of over $3 million.  Moreover, Defendants had actual knowledge of the misleading nature of the statements they made, or acted in reckless disregard of the true information known to them at the time.  In so doing, Defendants participated in a scheme to defraud and committed acts, practices, and participated in a course of business that operated as a fraud or deceit on purchasers of the Company's securities during the Class Period.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

72.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Amylyx securities during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures.  Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

73.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Amylyx securities were actively traded on the NASDAQ.  While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or

thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Amylyx or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

74.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

75.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.  Plaintiff has no interests antagonistic to or in conflict with those of the Class.

76.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Amylyx;

- whether the Individual Defendants caused Amylyx to issue false and misleading financial statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of Amylyx securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

77.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

78.     Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- Amylyx securities are traded in an efficient market;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NASDAQ and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiff and members of the Class purchased, acquired and/or sold Amylyx securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

79.     Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

80.     Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

**COUNT I**

**(Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)**

81.     Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

82.     This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

83.     During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities.  Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Amylyx securities; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire Amylyx securities and options at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

84.     Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Amylyx securities.  Such reports, filings, releases and statements were

materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Amylyx's finances and business prospects.

85.     By virtue of their positions at Amylyx, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants.  Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth.  In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

86.     Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control.  As the senior managers and/or directors of Amylyx, the Individual Defendants had knowledge of the details of Amylyx's internal affairs.

87.     The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein.  Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Amylyx.  As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Amylyx's businesses, operations, future financial condition and future prospects.  As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Amylyx securities was artificially inflated throughout the Class Period.  In

ignorance of the adverse facts concerning Amylyx's business and financial condition which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired Amylyx securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

88.     During the Class Period, Amylyx securities were traded on an active and efficient market.  Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Amylyx securities at prices artificially inflated by Defendants' wrongful conduct.  Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid.  At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of Amylyx securities was substantially lower than the prices paid by Plaintiff and the other members of the Class.  The market price of Amylyx securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

89.     By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

90.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure

that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

**(Violations of Section 20(a) of the Exchange Act Against the Individual Defendants)**

91.     Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

92.     During the Class Period, the Individual Defendants participated in the operation and management of Amylyx, and conducted and participated, directly and indirectly, in the conduct of Amylyx's business affairs.  Because of their senior positions, they knew the adverse non-public information about Amylyx's misstatement of income and expenses and false financial statements.

93.     As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Amylyx's financial condition and results of operations, and to correct promptly any public statements issued by Amylyx which had become materially false or misleading.

94.     Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Amylyx disseminated in the marketplace during the Class Period concerning Amylyx's results of operations.  Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Amylyx to engage in the wrongful acts complained of herein. The Individual Defendants, therefore, were "controlling persons" of Amylyx within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Amylyx securities.

95.     Each of the Individual Defendants, therefore, acted as a controlling person of Amylyx.  By reason of their senior management positions and/or being directors of Amylyx, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Amylyx to engage in the unlawful acts and conduct complained of herein.  Each of the Individual Defendants exercised control over the general operations of Amylyx and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

96.     By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Amylyx.

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

A.     Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.     Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.     Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.     Awarding such other and further relief as this Court may deem just and proper.

### DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated: February 9, 2024                       Respectfully submitted,

                                              POMERANTZ LLP

                                              _/s/ Jeremy A. Lieberman_____
                                              Jeremy A. Lieberman

J. Alexander Hood II
James M. LoPiano
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (917) 463-1044
jalieberman@pomlaw.com
ahood@pomlaw.com
jlopiano@pomlaw.com

*Attorneys for Plaintiff*

## CERTIFICATION PURSUANT
## <u>TO FEDERAL SECURITIES LAWS</u>

1.      I, Oliver Shih make this declaration pursuant to Section 27(a)(2) of the Securities Act of 1933 ("Securities Act") and/or Section 21D(a)(2) of the Securities Exchange Act of 1934 ("Exchange Act") as amended by the Private Securities Litigation Reform Act of 1995.

2.      I have reviewed a Complaint against Amylyx Pharmaceuticals, Inc. ("Amylyx") and authorize the filing of a comparable complaint on my behalf.

3.      I did not purchase or acquire Amylyx securities at the direction of plaintiffs' counsel or in order to participate in any private action arising under the Securities Act or Exchange Act.

4.      I am willing to serve as a representative party on behalf of a Class of investors who purchased or otherwise acquired Amylyx securities during the Class Period as specified in the Complaint, including providing testimony at deposition and trial, if necessary.  I understand that the Court has the authority to select the most adequate lead plaintiff in this action.

5.      The attached sheet lists all of my transactions in Amylyx securities during the Class Period as specified in the Complaint.

6.      During the three-year period preceding the date on which this Certification is signed, I have not served or sought to serve as a representative party on behalf of a class under the federal securities laws.

7.      I agree not to accept any payment for serving as a representative party on behalf of the class as set forth in the Complaint, beyond my pro rata share of any recovery, except such reasonable costs and expenses directly relating to the representation of the class as ordered or approved by the Court.

8.    I declare under penalty of perjury under the laws of the United States of America

that the foregoing is true and correct.


**Executed January 29, 2024**
              **(Date)**


_____
              **(Signature)**


Oliver Shih
              **(Type or Print Name)**

**Amylyx Pharmaceuticals, Inc. (AMLX)**                                              **Oliver Shih**

### List of Purchases and Sales

| Transaction Type | Date | Number of Shares/Unit | Price Per Share/Unit |
|---|---|---|---|
| Purchase | 4/11/2023 | 50 | $28.3211 |
| Purchase | 9/11/2023 | 50 | $20.5937 |